88 P.3d 1174

**STATE of Arizona, Appellee,**

v.

**Marcus Larue WATKINS, Appellant.**

**No. 1 CA–CR 03–0197.**

Court of Appeals of Arizona, Division 1, Department B.

May 4, 2004.

As Amended May 5, 2004.

Terry Goddard, Attorney General By Randall M. Howe, Chief Counsel, Criminal Appeals Section, and David Wood, Assistant Attorney General, Phoenix, Attorneys for Appellee.

James J. Haas, Maricopa County Public Defender By Louise Stark, Deputy Public Defender, Phoenix, Attorneys for Appellant.

**OPINION**

LANKFORD, Judge.

¶1 Defendant Marcus Watkins appeals from the superior court's denial of his motion to suppress evidence seized after a stop and pat-down for weapons. The court denied the motion and admitted evidence obtained in the stop and frisk. Defendant contends that the stop and frisk were unlawful and therefore that the court should not have admitted the contraband as evidence.

¶2 This appeal requires us to decide first whether stopping Defendant violated the Fourth Amendment of the United States Constitution. To answer that question, we consider whether stopping a person who appears to have firsthand, material information about a recently committed felony is constitutional. If we decide that the initial stop was lawful, we must then determine whether the subsequent frisk and seizure of evidence violated the Fourth Amendment. We hold that the Constitution permits the stop, the frisk and the seizure.

¶3 The events that led to Defendant's arrest are as follows. Late at night, the victim entered her apartment and saw two men leaving through the back door with her property. She observed them enter a vehicle and drive away. The victim recognized the men as acquaintances of Defendant. The victim went to Defendant's apartment[1] to inquire about the suspects and call police. When she arrived, the suspects were in the apartment along with Defendant. She confronted the suspects and one of them choked her after she had told them to either return the property or she would call police. After the altercation, Defendant suggested that they proceed to another apartment to call police. The victim and Defendant did so, and then the victim returned home to wait for the police.

¶4 Shortly thereafter, at around 11:00 p.m., Officers Neese and Boulter arrived and spoke to the victim. She described the burglary suspects as two Hispanic males. She also told the officers that she had confronted the suspects in Defendant's apartment. After she and the officers began walking to

---

1. The testimony conflicts on whether Defendant    lived in the apartment or merely frequented it.

Defendant's apartment, the officers noticed Defendant walking about fifty to seventy feet away. Officer Neese considered Defendant an investigative lead. Officer Boulter thought that Defendant may have been involved in the burglary and, at a minimum, was an investigative lead.

¶ 5 Officer Boulter asked Defendant to stop. Defendant stopped, but then immediately started to make furtive movements with his hands toward his waist. It appeared to the officers that he was arranging his clothes as if to hide or retrieve something. The officers were concerned that Defendant might have a weapon.

¶ 6 The officers approached Defendant and asked for his consent to conduct a pat-down search for weapons. Defendant said nothing, but opened up his jacket. Officer Boulter patted Defendant's waist and felt stems of marijuana protruding above his waistline. Officer Boulter then asked Defendant to hand the drugs to the officer.

¶ 7 Defendant refused, moved the officer's hand away, and attempted to flee. Both officers pursued Defendant and overtook him. Defendant was within Officer Boulter's view during the brief chase. Officer Boulter removed the marijuana from Defendant's waistband. Officer Neese then conducted a search incident to an arrest and discovered cocaine. The officers placed Defendant in the patrol vehicle before completing their search. The transporting officer later found a loaded gun wedged under the seat of the vehicle.

¶ 8 The State charged Defendant with one count of possession of narcotic drugs, a class 4 felony, and one count of possession of marijuana, a class 6 felony.

¶ 9 Defendant moved to suppress the State's evidence, arguing that the marijuana was inadmissible as the product of the officer's illegal frisk. Defendant contended that the officer lacked reasonable suspicion both to detain him and to conduct a pat-down.

Following a suppression hearing at which the officers testified, the court denied Defendant's motion to suppress.

¶ 10 Defendant testified at trial. He admitted carrying the loaded gun but denied that he had possessed cocaine or marijuana. The jury convicted him of possession of marijuana and acquitted him of possession of cocaine. The court sentenced Defendant to probation under Proposition 200 under Arizona Revised Statutes ("A.R.S.") section 13–901.01 (Supp.2003). Defendant timely appealed.[2]

¶ 11 We have jurisdiction pursuant to the Arizona Constitution, Article 6, Section 9, and A.R.S. § 13–4032(6) (2001). We review the grant or denial of a motion to suppress for abuse of discretion. *State v. Sanchez,* 200 Ariz. 163, 165, ¶ 5, 24 P.3d 610, 612 (App.2001). While we view the evidence in the light most favorable to upholding any factual findings, we review de novo the legal conclusions on which the ruling rests. *Id.*

¶ 12 Defendant challenges the admission of evidence as the forbidden fruit of an unlawful, warrantless search. Evidence found during an unlawful search is generally excluded. *State v. Cañez,* 202 Ariz. 133, 151, ¶ 52, 42 P.3d 564, 582 (2002). Defendant's attack on the court's admission of evidence places three events at issue: the stop of Defendant, the search of Defendant, and the seizure of the evidence. We address each of these events and their legality in turn.

¶ 13 If a police officer conducts a warrantless stop of a citizen, the Fourth Amendment requires that the stop be reasonable. *United States v. Brignoni–Ponce,* 422 U.S. 873, 878, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975). "The touchstone of the Fourth Amendment is reasonableness. The Fourth Amendment does not proscribe all state-initiated searches and seizures; it merely proscribes those which are unreasonable." *Florida v. Jimeno,* 500 U.S. 248, 250, 111

**2.** The State argues that Defendant waived any argument challenging the initial stop. However, he preserved the contention by questioning the propriety of the stop at the suppression hearing, an issue the court addressed. *See State v. Briggs,* 112 Ariz. 379, 382, 542 P.2d 804, 807 (1975)

("The essential question [for waiver] is whether or not the objectionable matter is brought to the attention of the trial court in a manner sufficient to advise the court that the error was not waived.").

S.Ct. 1801, 114 L.Ed.2d 297 (1991). In determining whether a stop is reasonable under the Fourth Amendment, we must look to the balancing test set forth in *Brown v. Texas,* 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979). "Consideration of the constitutionality of [seizures less intrusive than arrest] involves a weighing of the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty." *Id.* at 50–51, 99 S.Ct. 2637; *State v. Tykwinski,* 170 Ariz. 365, 367, 824 P.2d 761, 763 (App.1991).

¶ 14 The investigative stop[3] of Defendant as a material witness passes the *Brown* test of reasonableness. The first factor, the public's concern for the apprehension of known violent criminals, is present here. "Important in the balancing of interests is society's compelling interest to keep a community safe from those who would act against it." *Tykwinski,* 170 Ariz. at 370, 824 P.2d at 766. The rationale for the stop of Defendant to obtain information is at least as powerful as that which justified the roadblock in *Illinois v. Lidster,* —— U.S. ——, 124 S.Ct. 885, 157 L.Ed.2d 843 (2004). There, police set up a highway checkpoint in the same area where a person was killed a week earlier. *Id.* at 888. Police asked motorists stopped at the checkpoint for information about the incident. In determining that the public concern was sufficiently grave, the court stated that "the stop's objective was to help find the perpetrator of a specific and known crime, not of unknown crimes of a

general sort." *Id.* at 891. Here as well "[t]he relevant public concern was grave." *See id.* These police officers were investigating the serious crime of burglary and the violent crime of assault, both of which had occurred very recently. Moreover, the officers knew the victim had encountered the suspects at Defendant's apartment, and that Defendant was present when one of the suspects choked the victim. Defendant could have provided both an identification of the suspects and perhaps their current location, along with such critical information as whether they were armed. The stop was therefore not only to investigate "a specific and known crime," but was a stop of an identified eyewitness to at least one specific and violent crime.[4]

¶ 15 The second factor of the *Brown* test is also satisfied. Stopping Defendant to ask him about the suspects and assault greatly furthers the public interest implicated here. The victim found the suspects at Defendant's apartment immediately after the burglary and Defendant witnessed one of the suspects choke the victim. The offenses had been committed so recently that the suspects might still be in the vicinity. The information available to the officers was that Defendant was likely able to assist them in identifying, locating and safely apprehending violent criminals. To permit Defendant to leave without attempting to obtain this information, when he could in all likelihood identify the suspects and was an eyewitness to the assault, would frustrate the officers'

---

3. In its brevity and limited intrusiveness, the stop of Defendant is similar to that in *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), in which police stopped a person based on suspicion of criminal activity. However, the *Terry* standard—reasonable suspicion, based on a totality of the circumstances, to believe the person the officer detains was about to commit or was committing a crime—does not apply because the justification for the *Terry* stop is somewhat different. *See* ¶ 18, *infra.*

4. Related to the concept of apprehension of violent criminals is the identification of witnesses for subpoena purposes. The discovery of truth is the lifeblood of our justice system. And conviction often requires identification of suspects by witnesses and eyewitness testimony.

It is very difficult to investigate or prosecute a crime without witnesses. Missing witnesses

have been the bane of more than one prosecution. Identifying the witnesses and obtaining their stories is thus an essential part of police work, and is best done as quickly as possible. A *Terry* stop of a ... witness is therefore the essence of good police work.

Charles L. Hobson, *Flight and* Terry: *Providing the Necessary Bright Line,* 3 Md. J. Contemp. Legal Issues 119, 139 (1992).

Because the victim informed the officers that Defendant lived in the apartment complex, this concern is not as strong here. In other circumstances, identifying a witness for subpoena purposes might be a *sufficiently powerful justification* when a police officer does not know where to locate the witness after a witness leaves the scene.

duty to investigate a known crime. *See State v. Miller*, 112 Ariz. 95, 97, 537 P.2d 965, 967 (1975) ("A policeman has the duty to be alert to suspicious circumstances and to investigate if necessary, provided that he is acting within constitutional limitations.") (citation omitted). Under these circumstances, the ability to detain Defendant to ask him for information increases the officers' ability to apprehend the perpetrators of serious crime.

¶ 16 These were exigent circumstances justifying the stop. *See Pierce*, 787 A.2d at 1288; *Hawkins v. United States*, 663 A.2d 1221, 1226 (D.C.1995). Exigent circumstances permitting temporary detention of a witness may exist when a crime has been reported recently, the officers are confronted with a rapidly-moving situation, or the police come upon a flight scenario. *Hawkins*, 663 A.2d at 1226–27. *See also Metzker v. State*, 797 P.2d 1219, 1221 (Alaska App.1990) (exigent circumstances required). *Cf. State v. White*, 160 Ariz. 24, 32–33, 770 P.2d 328, 336–37 (1989); *State v. Ault*, 150 Ariz. 459, 463, 724 P.2d 545, 549 (1986) (exigent circumstances can permit entry of home without warrant).

¶ 17 The third factor of *Brown* is fulfilled because the interference with Defendant's liberty was only minimally intrusive. Defendant was walking toward the parking lot when Officer Boulter said, "Hey, hold on a minute. Let me talk to you." The momentary stop [5] of a person to ask questions about a crime the person just witnessed is not unconstitutionally intrusive. This type of stop is no more inconvenient than a highway checkpoint conducted by police to ask drivers and passengers for information about a fatal hit and run accident that had occurred a week before. *Lidster*, —— U.S. at ——, 124 S.Ct. at 888. While this Court has acknowledged that officers may not stop pedestrians "for investigative purposes without any reasonable, objective grounds for doing so," *In re Maricopa County Juv. Action No. JT30243*, 186 Ariz. 213, 218, 920 P.2d 779, 784 (App.1996), the officers stopped Defendant based on the victim's identification. Defendant did not just happen to be walking in the general vicinity of a crime. The officers did not stop him on the mere possibility that he may have had useful knowledge. Thus, the officers' decision to stop him was not a result of arbitrariness, speculation, or an exercise of boundless discretion. "A central concern in balancing these competing considerations in a variety of settings has been to assure that an individual's reasonable expectation of privacy is not subject to arbitrary invasions solely at the unfettered discretion of officers in the field." *Brown*, 443 U.S. at 51, 99 S.Ct. 2637.

¶ 18 Other jurisdictions also allow officers to stop potential witnesses. *E.g., State v. Pierce*, 173 Vt. 151, 787 A.2d 1284, 1288 (2001) ("We agree that under some circumstances the balance tips in favor of allowing law enforcement officers to briefly stop a potential witness to a crime to obtain information even though the witness is not suspected of criminal conduct."); *State v. Go-*

---

**5.** One of the factors in measuring the level of intrusion is the length of detention. *See United States v. Martinez–Fuerte*, 428 U.S. 543, 566–67, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976) (brief stop of motorists at fixed checkpoint constitutional); *Tykwinski*, 170 Ariz. at 370, 824 P.2d at 766 ("The fourth amendment intrusion was short and explicitly planned to ferret out the danger."). A police officer who wishes to speak to a pedestrian or motorist in motion may need to issue a stop command to determine whether the person will voluntarily speak. If the citizen then decides to speak voluntarily, or if he refuses and police do not pursue the matter further, then the detention is only fleeting. *See State v. Richcreek*, 187 Ariz. 501, 505, 930 P.2d 1304, 1308 (1997) ("[T]he [United States] Supreme Court has held that police officers may approach individuals at random in public places to ask them questions as long as a reasonable person would understand that he or she could refuse to answer."). This intrusion is clearly less than that in a detention of a citizen for lengthy questioning. But in this case we do not know whether the police would have detained Defendant to pose questions because intervening events gave rise to a new justification for Defendant's detention.

Of course, police can always request to speak to a citizen. It is the command to stop that renders this situation a detention subject to constitutional scrutiny. *See Cañez*, 202 Ariz. at 151, ¶ 54, 42 P.3d at 582 (a person is seized for Fourth Amendment purposes when "police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.") (internal quotations and citation omitted).

*pher,* 193 Mont. 189, 631 P.2d 293, 296 (1981) ("The State's burden has two elements: (1) objective data from which an experienced officer can make certain inferences; and (2) a resulting suspicion that the occupant of a certain vehicle is or has been engaged in wrongdoing or was a witness to criminal activity."); *Barnhard v. State,* 86 Md.App. 518, 587 A.2d 561, 566 (1991) ("The momentary detention of a material witness to allow the police to investigate a crime is permissible, even if the police do not suspect the person of wrongdoing."); *People v. Hernandez,* 177 Misc.2d 882, 679 N.Y.S.2d 790, 795 (Sup.Ct.1998) (vehicle stop to question a witness to a recent violent crime under exigent circumstances was constitutional). *See also Kolender v. Lawson,* 461 U.S. 352, 366 n. 3, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983) (Brennan, J., concurring) ("Police officers may have a similar power [to detain an individual for the purpose of asking investigative questions] with respect to persons whom they reasonably believe to be material witnesses to a specific crime."); *Williamson v. United States,* 607 A.2d 471, 476 (D.C.1992) (Farrell, J., concurring) ("[The officer] was not required to sort out [the defendant's] exact role—participant *or* witness—before stopping him to inquire about a just-completed crime of violence."), *cert. denied,* 510 U.S. 829, 114 S.Ct. 96, 126 L.Ed.2d 63 (1993).

¶ 19 Having determined that the *Brown* balancing test favors the officers' stop of Defendant, we caution that an officer's ability to detain such a witness is not without limitation. As discussed above, officers may stop witnesses only in limited and exigent circumstances. *Pierce,* 787 A.2d at 1288. In conformity with this requirement, other courts have set forth the following guidelines for when an officer may stop a witness: (1) The officer reasonably believes a crime has just occurred near the area where he finds the person; (2) The officer reasonably believes the person has material knowledge regarding the crime; and (3) Stopping the person is

reasonably necessary to obtain information about the person or crime. *Id.* (quoting *Model Code of Pre–Arraignment Procedure* § 110.2(1)(b) (1975), and discussing 4 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 9.2(b), at 24–25 (3d ed.1996)); *Williamson,* 607 A.2d at 476; *City of Kodiak v. Samaniego,* 83 P.3d 1077, 1083–84 (Alaska 2004); *Hernandez,* 679 N.Y.S.2d at 794.

¶ 20 Without deciding whether we should adopt these standards, the circumstances of this investigative stop satisfied them. The victim called 911 after having been burglarized as soon as she could find a telephone. The officers arrived at the scene shortly thereafter. The officers were walking with the victim when she saw Defendant and identified him. The victim had told the officers she found the suspects in Defendant's apartment along with Defendant, and that Defendant had been present when one of the suspects choked her. The officers reasonably believed that Defendant had material knowledge of crime that the officers needed to investigate and apprehend the suspects. Defendant was walking toward the parking lot, apparently trying to leave the apartment complex. Because the officers were responding to a burglary that had just been committed, the violent crime of assault had occurred, the suspects may have been nearby, Defendant was an eyewitness to at least the assault and Defendant was about to leave, the circumstances warranted the officers' detention of Defendant. Accordingly, the stop of Defendant was constitutionally permissible.[6]

■ ¶ 21 Defendant next contends the pat-down was unlawful. After an officer has lawfully stopped an individual, he can briefly frisk that person only if a reasonably prudent officer under the circumstances would fear for his safety or the safety of those nearby. *See Terry,* 392 U.S. at 24, 88 S.Ct. 1868;

---

6. The superior court ruled on this basis. It found that the officers "were certainly justified out of precaution to contact [Defendant] to find out if he knew anything about the burglary since they were made aware that he knew the suspects." This case is clearly distinguishable from *Richcreek,* 187 Ariz. at 505, 930 P.2d at 1308, in

which police had no reason to believe the driver of the vehicle was a witness to a crime or could help them in their investigation. Without such evidence or evidence the defendant was involved in a crime, our supreme court held that the stopping of the vehicle was a violation of the Fourth Amendment.

*State v. Stricklin,* 191 Ariz. 245, 246, 955 P.2d 1, 2 (App.1996). An officer need not be certain in his belief that one may be armed. The *Terry* court held that an officer "need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." 392 U.S. at 27, 88 S.Ct. 1868. This is a rule for officer safety that does not additionally require reasonable suspicion of other criminal activity.[7]

¶ 22 The officers were legitimately concerned for their safety. They had sufficient reason to suspect Defendant had a weapon. After the officers commanded him to stop and while they were approaching him, Defendant lifted his jacket, and moved his hands to his waistband and under his shirt. Defendant aroused the officers' suspicion by moving his hands toward an area of the body where weapons are often concealed or worn. Furtive movements near the waist support the inference that a person may be armed. *See, e.g., United States v. Brown,* 273 F.3d 747, 748–49 (7th Cir.2001) (finding a pat-down supported, in part, by the suspect's hand movements near his lap area); *see also State v. Riley,* 196 Ariz. 40, 45, ¶ 16, 992 P.2d 1135, 1140 (App.1999) (movement toward the waistband in response to a question about weapons meant officer had a justifiable concern for his safety and thus a pat-down was valid).

¶ 23 The circumstances surrounding the officers' encounter with Defendant further evidence the reasonableness of the officers' fear of danger. It was 11:00 p.m. The officers were responding to a report of burglary and assault, a crime of violence. Defendant had been with the suspects and indeed was present when a suspect choked the victim. The officers also testified that, in their experience, burglary calls commonly involve suspects carrying weapons. Defendant argues that the victim told the officers that Defendant was not involved in the burglary and thus the officers had no reasonable suspicion to pat-down Defendant, but it was Defendant's furtive movements and not the victim's statements that support the frisk.

¶ 24 Defendant cites two cases to demonstrate that the search was unreasonable, both of which are distinguishable. The court in *In re Steven O.,* 188 Ariz. 28, 932 P.2d 293 (App.1997), found the pat-down illegal because the officer failed to provide objective facts to support a belief that the search was necessary, the subject was not a known criminal, he made no threatening gestures, there was nothing suspicious about his attire and the encounter occurred during the middle of the day. *Id.* at 32, 932 P.2d at 297. In contrast, in this case the officers provided objective facts to support the search of Defendant.

¶ 25 Also distinguishable is *State v. Rogers,* 186 Ariz. 508, 924 P.2d 1027 (1996), which involved a frisk after an illegal stop. *Rogers* held an investigative *Terry* stop unlawful when the officers stated only that it was dark and that the defendant and his companion emerged from the bushes and stared at the officers. *Id.* at 511, 924 P.2d at 1030. Although a pat-down of the defendant yielded no evidence, narcotic drugs were found on the route the defendant had used to evade the officers. *Id.* at 509–10, 924 P.2d at 1028–29. Our supreme court determined that the stop violated the Fourth Amendment. *Id.* at 511, 924 P.2d at 1030. Here, however, we have held that the stop of Defendant did not violate the Fourth Amendment.

¶ 26 We must next decide whether the seizure of the marijuana was valid. It was. The marijuana was detected during the lawful pat-down for weapons. Contraband may be seized if, during a lawful frisk, the officer feels an object he knows is contraband without the need to manipulate it. *State v. Valle,* 196 Ariz. 324, 327, ¶ 10, 996 P.2d 125, 128 (App.2000). While conducting a brief pat-down of Defendant's outer clothing, Officer Boulter put his hand flat against Defendant's stomach, felt a plastic baggie and was poked by stems. Because the officer immediately recognized the item as marijuana, he had probable cause to believe the item was contraband, and thus the seizure of the marijuana was lawful. *See Minnesota v. Dickerson,* 508 U.S. 366, 375, 113 S.Ct. 2130, 124

---

7. Carrying a concealed weapon without a permit    is a crime. A.R.S. § 13–3102(A)(1) (Supp.2003).

L.Ed.2d 334 (1993) ("If a police officer lawfully pats down a suspect's outer clothing and feels an object whose contour or mass makes its identity immediately apparent, there has been no invasion of the suspect's privacy beyond that already authorized by the officer's search for weapons. . . .").

¶ 27 For these reasons, the officers' conduct did not violate the Fourth Amendment and the superior court correctly denied the motion to suppress the evidence found incident to the search. Accordingly, we affirm.

CONCURRING: DONN KESSLER and DANIEL A. BARKER, Judges.